UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

ESP SYSTEMS, LLC, a Florida Limited Liability Company

*Plaintiff,*

vs.

NIGHTINGALE NURSES, LLC, a Florida Limited Liability Company

*Defendant.*

CASE NO:

**COMPLAINT**

Plaintiff ESP Systems, LLC d/b/a MedTemps ("MedTemps") files this complaint for damages, injunctive relief and declaratory relief against Nightingale Nurses, LLC ("Nightingale") and in support states as follows:

**INTRODUCTION**

1. Plaintiff MedTemps and Defendant Nightingale are competitors in the medical staffing business.

2. This case arises out of a multi-faceted and long-running fraudulent scheme by Nightingale Nurses that has jeopardized the public welfare, robbed the government of tax revenue and allowed that company to gain an unfair competitive advantage in the medical staffing market.

3. Nightingale's scheme consists of three primary components: (1) Forgery of various health

1

documents and related false advertising; (2) tax evasion; and (3) kickbacks.

4. First, Nightingale forges various health documents. In order to place nurses in hospitals and other medical facilities, those nurses must undergo a variety of medical tests and certain health-related screening (e.g. testing for communicable diseases; testing for drug use; etc.).

5. If this testing and accompanying paperwork is not complete and submitted to the client site by the nurse's start date, the nurse cannot begin work and the staffing company often loses the job.

6. In this industry, time is of the essence. So, Nightingale has fashioned a workaround: Forging the necessary documents. For the past several years and as a matter of pattern and practice, Nightingale has routinely forged a litany of health-related documents to avoid any delays related to completing the necessary health screenings and ensure that its nurses are always at the client site and ready to begin work on day one.

7. Second, Nightingale has engaged in a long-running tax evasion scheme based on bogus per diem payments. Rather than pay certain employees actual wages, Nightingale illegally pays those employees in per diems, often dramatically inflated ones.

8. In order to facilitate this scheme, Nightingale routinely uses forged leases. These forged leases are used to establish that the employees at issue live many miles away from the hospitals where they are staffed, thereby rendering them eligible for large per diem payments.

9. By shifting what should be taxable wages to illegal per diem payments, Nightingale has evaded taxes and lowered its operating costs, thereby again gaining an unfair competitive advantage in the marketplace.

10. Third, Nightingale routinely and as a matter of pattern and practice pays kickbacks to certain

2

hospital employees who are involved in the staffing process. Nightingale pays these kickbacks directly to those hospital employees without their employers' knowledge and in blatant violation of those hospitals' operating procedures. As a result of Nightingale's illegal and unethical kickbacks, Nightingale has – yet again – gained an unfair advantage in the marketplace.

11. This is an action for false advertising in violation of the Lanham Act; violations of FDUTPA; and declaratory relief. Plaintiff seeks damages stemming from Nightingale's wrongful conduct to the fullest extent permitted by law; an injunction prohibiting further false advertising; an injunction barring Defendant from placing any medical personnel with hospitals for the pendency of this litigation or until such time as Nightingale can demonstrate that it has taken appropriate remedial action; an affirmative injunction requiring Nightingale to engage in corrective advertising and make appropriate disclosures to its clients and prospective clients; and a declaratory judgment holding that Nightingale – as essentially an illegal enterprise – cannot enforce any of its restrictive covenants with its current or former employees.

**THE PARTIES**

12. Plaintiff, ESP Systems LLC, d/b/a MedTemps is a Florida Limited Liability Company with its principal place of business located at 2500 Quantum Lakes Drive, Suite 203, Boynton Beach, FL 33426.

13. Defendant, Nightingale Nurses, LLC is a Florida Limited Liability Company with its principal place of business located at 6401 Congress Avenue, Suite 250, Boca Raton, FL 33487.

14. Both companies are engaged in the medical staffing business.

3

## JURISDICTION

15. The Court has subject matter jurisdiction under 28 U.S.C. §1331 for claims arising under §43(a) of the Lanham Act, 15 U.S.C. §1125 and under 28 U.S.C. § 2201 for claims arising under the Declaratory Judgment Act.

16. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

## VENUE

17. Venue in this Court is based upon 28 U.S.C. §1391.

18. Defendant Nightingale's principal place of business is located within this judicial district.

19. Defendant Nightingale is subject to this Court's personal jurisdiction.

20. Defendant Nightingale has the most significant contacts in the State of Florida within this judicial district.

21. As such, venue in this Court is proper.

## GENERAL ALLEGATIONS

22. Both Plaintiff and Defendant operate as staffing agencies in order to place nurses in nursing jobs in healthcare facilities nationwide.

23. Both Plaintiff and Defendant advertise their services to healthcare facilities nationwide.

24. Both Plaintiff and Defendant recruit nurses from throughout the nation in order to fulfill the staffing needs of the healthcare facilities with which they do business.

25. Plaintiff and Defendant are direct competitors.

### The Joint Commission and Nightingale's Central False Advertisement

26. Nightingale holds itself out to the public as being Health Care Staffing Services

certified by the Joint Commission, the relevant credentialing body.

27. Nightingale prominently displays the Joint Commission's gold seal of approval and related language on their website. **Exhibit A.**

28. The Joint Commission is an independent, not-for-profit organization, that "accredits and certifies nearly 21,000 health care organizations and programs in the United States. Joint Commission accreditation and certification is recognized nationwide as a symbol of quality that reflects an organization's commitment to meeting certain performance standards." [1]

29. The Joint Commission's Quality Check program lists accredited and certified entities and makes the list available for public viewing.[2]

30. From the website, individuals can search for Quality Reports and download historical Quality Reports for each entity certified by the commission, including Nightingale.[3]

31. The President's Message introducing Nightingale's November 18, 2015 Quality Report reads, in part, "We know how important reliable information is when making health care decisions… When a health care staffing firm seeks certification, it demonstrates a strong commitment to providing safe, high quality health care and to continually working to improve that care." **Exhibit B at 2.**

32. By displaying the Joint Commission's seal of approval on their website and otherwise putting the consuming public on notice that they are Joint Commissions certified, Nightingale advertises to the consuming public that it has met and maintained all of the evaluation criteria required to become Joint Commission certified.

33. According to the Joint Commission's HCSS Certification Manual, "The Joint Commission's

---

[1] Available at https://www.jointcommission.org/about_us/about_the_joint_commission_main.aspx.
[2] https://www.qualitycheck.org/
[3] Available at https://www.qualitycheck.org/certification-history/?bsnId=404760.

5

Health Care Staffing Services (HCSS) Certification Program provides an independent, comprehensive evaluation of a staffing firm's ability to provide qualified and competent temporary staffing services." **Exhibit C at 1.**

34. Falsification of information relevant to the Joint Commission's certification process results in the denial of certification to a staffing firm. *Id.* at 24-25.

35. Of utmost importance to the Joint Commission is screening for immediate threats to health or safety. *Id.* at 48.

36. To that end, the Joint Commission has identified a variety of standards applicable to staffing firms, including, in relevant part:

    a. The HCSS firm confirms that a person's qualifications are consistent with his or her assignment(s).

*Id.* at 82.

37. A critical component of this standard (HSHR 1) is that the staffing firm "Verifies and documents compliance with applicable health screening and immunization requirements established by law, regulation and the firm's policy or its customers' requirements." *Id.* at 84.

38. Instead of adhering to these and related standards, Nightingale has instituted a program designed to deceive the Joint Commission, its customers, the public at large and, ultimately, the patients who receive treatment from the professionals that Nightingale staffs.

39. Although Nightingale holds itself out to the public and its customers as being in full compliance with Joint Commission certification requirements and all applicable laws and regulations regarding health screenings, that representation is false.

40. As a matter of pattern and practice, Nightingale routinely forges a variety of health-

screening related paperwork.

41. In order for nurses to begin their assignments at client hospitals, they must undergo a series of health screenings depending on applicable state and hospital regulations. Hospitals and medical facilities routinely screen prospective staff for immunizations, communicable diseases, and drug use among other things.

42. If Nightingale – or a competing vendor – does not have all of these health screenings completed and the paperwork in place by the employee's start date, that employee cannot begin work and the staffing company does not get paid.

43. In many instances, if a staffing company fails to produce the employee on the start date with all of the necessary health screening and corresponding paperwork completed, they lose the job and another staffing company is given the opportunity to fill the position.

44. In this industry, time is of the essence. Delays in health screening routinely result in lost business.

45. In order to ensure that Nightingale's candidates are always ready to start work on day one, Nightingale has taken steps to eliminate delays in health screening and obtaining the appropriate corresponding paperwork.

46. Nightingale's strategy is a simple one: Whenever necessary, forge the relevant health documents. This strategy was implemented and is directed by Nightingale employee Noel Espinoza at the behest of and with the blessing of Nightingale's leadership. At present, the primary day-to-day forgers at Nightingale are Espinoza and Jennifer McGhee.

47. Nightingale repeatedly has forged health screening documents including but not limited to: results of urinalysis testing for drug use; results of tests for measles, mumps and rubella; results of tuberculosis tests; confirmation of administrating tetanus vaccinations;

confirmation of administering influenza vaccinations; results of administering tests for hepatitis; and more.

48. In connection with forging these health documents and screening results, Nightingale routinely uses templates designed to appear as though issued by actual screening facilities. Specifically, Nightingale uses forged documents that purport to be issued by First Lab, Quest Diagnostics, Concentra Urgent Care and others. In addition, Nightingale routinely certifies that the employees have undergone various screenings when those screenings were never conducted.

49. By way of example of specific instances of forgery (solely to demonstrate the breadth of Nightingale's fraud):

   a. Nightingale forged the results of a urine test for a female employee on July 12, 2016. Nightingale placed the forged results on fictitious First Lab letterhead.

   b. Nightingale forged the results of a tuberculosis test on May 26, 2016 and placed the results on a fictitious Concentra letterhead.

   c. Nightingale forged the results of a measles, mumps and rubella test for a female employee on March 7, 2016 and placed the forged results on fictitious Quest Diagnostics letterhead.

   d. Nightingale forged a confirmation of administration of influenza vaccine on September 22, 2014.

   e. Nightingale forged the results of a hepatitis-B test for a female on April 4, 2014 and placed the forged results on fictitious letterhead for Advanced Toxicology Network.

   f. Nightingale forged a vaccine administration record for a tetanus and diphtheria vaccination administered to a female on February 24, 2015 and placed the forged

8

results on fictitious Concentra letterhead.

50. These are merely examples. Nightingale has engaged in this type of forgery as part of its culture and its ordinary course of business. For the past several years, Nightingale has forged these documents in at least hundreds and possibly thousands of instances.

**Nightingale's Tax Evasion Scheme**

51. Nightingale has engaged in a long-running tax evasion scheme based on bogus per diem payments. Rather than pay certain employees actual wages, Nightingale illegally pays those employees in per diems.

52. In order to facilitate this scheme, Nightingale routinely uses forged leases. These forged leases are used to establish that the employees at issue live a certain number of miles away from the hospitals where they are staffed, thereby rendering them eligible for per diem payments.

53. For example: There is a nurse staffed by Nightingale named Terry Ratliff. Mr. Ratliff is staffed at Charleston Area Medical Center in Charleston, WV.

54. In connection with paying Mr. Ratliff a per diem rate, Nightingale forged a lease. **Exhibit D.** The forged lease indicates that Mr. Ratliff rents a property – his supposed home address – at 8306 Ferndale Rd., Louisville, KY 40291. The lease is an outright forgery. Mr. Ratliff does not lease that property and does not reside there. That address is not his home address. Instead, Mr. Ratliff lives in Ashalnd, KY, much closer to his work site. Nightingale simply uses the fake address – roughly 250 miles from the job site – to pay the employee through an inflated per diem, rather than pay actual wages.

55. This particular lease lists "Re-Max Metro" as the Landlord. Re-Max Metro is a real estate agency based in Louisville. They do not own or otherwise lease properties. The document

9

is a classic Nightingale forgery.

56. A second example of the per diem scam involves a Nightingale employee or recent former employee Dominic Vendetta. Mr. Vendetta is or recently was staffed at Hunterdon Healthcare in Flemington, NJ. Mr. Vendetta lives in Philadelphia. But not according to Nightingale. A forged Nightingale lease suggests that Mr. Vendetta lives at 11 Lighthouse Dr., Rehoboth Beach, DE, some 170 miles away from his work site. **Exhibit E.** Once again, the lease lists a real estate agency, this time Coldwell Banker, as the landlord. Coldwell Banker does not own the property at issue and Mr. Vendetta does not reside there. Nightingale simply forged the lease.

57. Nightingale does all of this to pay employees via inflated per diems based on bogus travel time and mileage, as opposed to wages. By shifting what should be taxable wages to illegal per diem payments, Nightingale has evaded payroll taxes (to the tune of at least hundreds of thousands of dollars) and lowered its operating costs, thereby again gaining an unfair competitive advantage in the marketplace.

### Nightingale's Kickback Scheme

58. Nightingale routinely and as a matter of pattern and practice pays kickbacks to certain hospital employees who are involved in the staffing process in order to secure placements at those hospitals.

59. Rather than compete with other market participants on the merits, Nightingale has set up a scheme in which it pays certain hospital employees for securing placements.

60. At most hospitals, there is fierce competition on the merits. The placement goes to the staffing company that can produce the best candidate, produce them quickly and produce them at an attractive rate.

61. At certain hospitals, however, Nightingale has effectively cornered the market via bribery.

62. Nightingale employee Kevin Pate is largely responsible for orchestrating the scheme and does so with the blessing of Michael List among other company leaders. Pate purchases Visa or Mastercard gift cards on a Nightingale company credit card. He then gives $250 or $300 worth of gift cards to certain hospital employees for each placement secured.

63. For instance, Nightingale routinely pays kickbacks to Eddy Manoyrine, the Staffing Coordinator at North Shore Medical Center in Miami. Nightingale pays Mr. Manoyrine $300 worth of gift cards per placement he secures. In exchange for this kickback, Mr. Manoyrine violates North Shore's staffing policies and procedures and gives Nightingale hiring preference. Not surprisingly, Nightingale prominently displays a testimonial from Mr. Manoyrine on its website. All of this is done without the hospital's knowledge.

64. Multiple Nightingale employees, including company leadership, certain directors and former directors are well aware of all of the fraudulent practices outlined above.

## COUNT I
## FALSE ADVERTISING UNDER 15 U.S.C. §1125(a)

65. Plaintiff repeats and realleges the foregoing as if fully set forth herein.

66. Plaintiff and Defendant are direct competitors in the medical staffing business.

67. Both Plaintiff and Defendant are engaged in competitive business throughout the United States.

68. Defendant has made advertisements and misleading factual representations related to its services.

69. Defendant has made such false and misleading representations on its website and directly to its customers and prospective customers.

70. Most significantly, Defendant holds itself out as being Joint Commission Certified. In representing itself as Joint Commission Certified, Defendant is representing that it has satisfied all of the requirements for such certification.

71. Defendant has not satisfied such requirements and does not comply with the Joint Commission guidelines.

72. A critical part of compliance with those guidelines is complying with all applicable health screening regulations and requirements.

73. Defendant holds itself out to the public and its customers as having complied with all such guidelines. Defendant's advertisements and representations in this respect are false.

74. At the very least, Defendant's representations are likely to mislead, confuse or deceive customers and prospective customers.

75. Defendant has made such false and misleading representations in order to influence customers to buy Defendant's services.

76. Defendant's false and misleading representations have deceived and confused Defendant's customers and have the capacity to continue to deceive Defendant's customers and prospective customers.

77. To wit: No customers would do business with Nightingale if they were aware that, in spite of holding itself out as Joint Commission Certified, Nightingale forges health-related documents and routinely violates Joint Commission guidelines.

78. Defendant has made these false and misleading representations in interstate commerce and these false and misleading representations affect interstate commerce.

79. Defendant's false and misleading representations have had a negative material effect on MedTemps' business and the business of other competitors.

80. Defendant's false and misleading representations pose a threat of imminent harm to the general public.  Defendant places nurses in hospitals throughout the country.  Defendant leads its hospital clients to believe that all such nurses have been subjected to and passed appropriate health screenings.  In reality, Defendant has forged the relevant health-related documents.

81. At this very moment, there are nurses and medical personnel staffed by Nightingale in hospitals throughout the country who may lack various vaccinations; may have various health conditions; may have communicable diseases; and/or may be drug users, but who have never been screened for any of these things.

82. As a result of Defendant's conduct, MedTemps, other competitors and the public at large have been damaged in an amount to be determined at trial.

83. In addition, Defendant's ongoing conduct posses an immediate threat to the public welfare and must be enjoined.

## COUNT II
## VIOLATION OF FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT
## FLA. STAT. § 501.201

84. Plaintiff repeats and realleges paragraphs 1 through 64 as if fully set forth herein.

85. Defendant's entire operation is an illegal enterprise.

86. Defendant forges health-related documents to gain an advantage in the nurse placement process.  Defendant saves time and money by forging these health-related documents and is able to place its nurses in hospitals more quickly than its competitors including Plaintiff.

87. Defendant reduces its tax liability by paying employees via illegal and fraudulent per diems rather than paying them via taxable wages.  As a result, Defendant saves

significant sums of money on payroll taxes, lowers its operating costs and thereby gains an unfair advantage against competitors including Plaintiff.

88. Defendant pays kickbacks to certain hospital employees, unbeknownst to those hospitals and in violation of those hospitals' operating procedures. As a result, Defendant gains an unfair advantage against its competitors including Plaintiff.

89. Defendant's entire course of conduct constitutes a deceptive and unfair trade practice in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 - 501.213.

90. As a direct and proximate result of Defendant's deceptive and unfair trade practices, Plaintiff has been damaged in an amount to be determined at trial.

91. As a direct and proximate result of Defendant's deceptive and unfair trade practices, the public has been damaged and public health and safety are presently in imminent danger.

## COUNT III
## DECLARATORY JUDGMENT

92. Plaintiff repeats and realleges paragraphs 1 through 64 as if fully set forth herein.

93. Nightingale requires substantially all of its employees to execute employment agreements that contain various restrictive covenants, including restrictive covenants that (1) constitute a blanket prohibition against any former employee working for any competitive business in any capacity whatsoever and (2) that bar solicitation of any of Nightingale's customers or clients, both for a period of one-year following separation from the company.

94. These restrictive covenants are not necessary to protect any legitimate business interest.

95. The industry is transparent and highly competitive.  Hospitals advertise open positions that need to be filled on multiple publicly available websites.  Staffing companies compete to fill those positions.

96. Staffing companies such as Nightingale and MedTemps easily can identify prospective clients (i.e. hospitals) and the relevant contact people through publicly available resources (Google, LinkedIn, the hospital "Blue Book").

97. If a staffing company wishes to be notified directly by a hospital when that hospital has candidate openings, that hospital can apply to be a potential vendor.

98. Hospitals routinely send emails regarding open positions to multiple potential vendors, often dozens of them.

99. There is no valuable, confidential information that could constitute a legitimate business interest sufficient to justify enforcement of any of the restrictive covenants at issue.

100. Nightingale employees are not exposed to any valuable, confidential information that is proprietary and otherwise not available to a competitor in the industry.

101. There are no substantial customer relationships that could constitute a legitimate business interest sufficient to justify enforcement of any of the restrictive covenants at issue.

102. Hospitals do not maintain exclusive or near exclusive relationships with any one vendor (except potentially in instances where Nightingale is paying illegal kickbacks to certain employees of those hospitals unbeknownst to those hospitals and against those hospitals' operating procedures and regulations).

103. The customers – the hospitals – and the contact information for the relevant contact persons at those hospitals can be readily and easily identified via publicly available resources.

104. No staffing agency has any long-term contract in place with any of the customers at issue that guarantees that that agency will win the next placement.

105. With respect to any expectation of future business, the only reasonable expectation that any staffing agency can have is the expectation that they will be able to compete with other vendors to fill future open positions.

106. In all instances except where Nightingale is covertly paying illegal kickbacks, the staffing company that can source the best candidate in the quickest time frame and at the best rate wins. This is pure competition.

107. There is no interest in extraordinary or specialized training that would justify enforcement of the restrictive covenants at issue. There is no training beyond on the job training. This sort of on the job training is available at any number of competing companies within the medical staffing industry. To the extent Nightingale considers its method of doing business extraordinary, it is only extraordinary because of the fraudulent nature of its business practices. There is no protectable interest in training.

108. There are no other potential legitimate business interests that would justify enforcement of the restrictive covenants at issue.

109. As such, the restrictive covenants at issue are unenforceable under Florida Statutes 542.335 and constitute illegal restraints of trade.

110. Even if Nightingale had a legitimate business interest sufficient to justify enforcement of the restrictive covenants at issue (and Plaintiff denies that it does),

Nightingale cannot enforce any of the restrictive covenants at issue because of Nightingale's illegal, unethical, fraudulent, dangerous, unfair, deceptive and otherwise wrongful business practices.

111. Nightingale, which effectively operates as an illegal enterprise, cannot bind employees and former employees to any restrictive covenants because to do so would be a gross violation of public policy and reward Nightingale for its unclean hands and wrongful conduct.

112. A dispute therefore exists between Plaintiff and Nightingale regarding the validity and enforceability of the Nightingale's employee restrictive covenants.  Plaintiff's COO Randall Silva formerly worked for Nightingale (his restrictive covenant has since expired) and Plaintiff desires to hire certain Nightingale employees.

113. At all relevant times hereto, Nightingale has taken the position that its employee restrictive covenants are valid and enforceable, including so as to bar Plaintiff MedTemps from hiring any of its personnel.

114. The controversy involves the legal relationship of the parties, having adverse interests with respect to which the declaration is sought.

115. Accordingly, there exists an actual, practical, and present need for a declaration of the rights of the Parties pursuant to 28 USC § 2201.

**PRAYER FOR RELIEF**

Plaintiff requests the following relief:
   a. Damages to the fullest extent permitted by law under both the Lanham Act and FDUTPA;
   b. Punitive damages based on the willful and wanton nature of Nightingale's wrongful

      conduct;

   c. Corrective advertising under the Lanham Act in which Nightingale must communicate to all of its clients and potential clients that it has forged health-related documents and is not in compliance with Joint Commission guidelines;

   d. An affirmative injunction requiring Nightingale immediately to notify all current and prospective clients that it has forged health-related documents and is not in compliance with Joint Commission Guidelines and that such clients should conduct their own health screenings of all potentially impacted nurses and/or medical personnel.

   e. An injunction immediately suspending all of Nightingale's nurse placement activities pending Nightingale's ability to show compliance will all applicable healthcare staffing regulations;

c.    An award of attorney's fees and costs;

d.    Such other and further relief as the Court deems just and proper.

<u>JURY TRIAL DEMAND</u>

Plaintiff demands a jury trial on all issues so triable.

Dated: July 14, 2016

Respectfully submitted,

<u>By</u>: s/ *Jonathan E. Pollard*

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

Pollard PLLC
401 E. Las Olas Blvd. #1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
Facsimile: 866-594-5731

*Attorneys for Plaintiff*